IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NILSA ORTIZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-373-GMS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

### I.    INTRODUCTION

This case comes from the denial of Nilsa Ortiz's ("Ortiz") claim for Social Security

disability insurance benefits.  Ortiz applied for disability insurance benefits ("DIB") and

supplemental security income (SSI) under the Social Security Act, 42 U.S.C. §§ 401-433, on

July 29, 2002.  Her claim was denied initially and again upon reconsideration.  Following this

denial, Ortiz requested a hearing before an administrative law judge (the "ALJ"), and one was

held on January 12, 2005, ("first hearing") before Administrative Law Judge Judith A.

Showalter.  (D.I. 11 ("Tr.") 32-59.)  On March 16, 2005, the ALJ issued a written opinion

finding that Ortiz is not disabled within the meaning of the Social Security Act (the "Act") and

denying her claims.  (*Id.* at 16-27.)  Subsequently, on April 4, 2006, the appeals council rejected

Ortiz's request for review of the ALJ's decision.  (*Id.* at 5-7.)

Following the denial of the appeals council, Ortiz filed an appeal with this court on June

5, 2006.  (D.I. 2.)  Currently before the court are both parties' motions for summary judgment.

Because the court finds that the ALJ's decision does not meet the substantial evidence test, it will

deny both motions for summary judgment, reverse the decision of the ALJ, and direct the Commissioner to award disability benefits.

## II.     BACKGROUND

Ortiz was born on October 31, 1964, and completed eleven years of high school education. (Tr. 83-92.) Ortiz's disability claim stems from a motor vehicle accident that occurred on June 19, 2002, in which she sustained a left hip fracture and other injuries. (*Id.*) As a result of this accident, Ortiz underwent four separate surgeries to her left hip. (*Id.*) Despite these surgeries, she claims that she is rendered disabled. Ortiz was 37 years old at the onset of her alleged disability. (*Id.*) To be eligible for DIB and SSI, Ortiz must prove that she was disabled on or before December 31, 2003, the date her insured status expired. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1).

### A.     Medical Evidence

On June 20, 2002, Ortiz was admitted to Christiana Care Health Services following a motor vehicle accident. (Tr. 332.) Ortiz's hospital discharge summary stated that an x-ray of the pelvis and left hip revealed a fractured posterior dislocation of the left hip. (*Id.*) Open reduction and internal fixation of the fractured dislocation, as well as debridement and removal of the fractured fragment, was performed by Dr. Evan Crain. (*Id.* at 176.)

On July 11, 2002, Dr. Crain noted that an x-ray of the pelvis revealed "the loss of approximately 20% of the [femoral] head" and a fracture that began "at the level of the fovea and extend[ed] lower to the teardrop." (*Id.* at 172-173.) The fracture "amounted to five pieces that could not be adequately repaired." (*Id.*) On August 8, 2002, an MRI performed by St. Francis

2

Hospital Department of Radiology revealed "a contusion of the humeral head with a mild degree of subdeltoid bursitis." (*Id.* at 169.)

On August 28, 2002, Ortiz advised Dr. Crain that she felt a clicking sensation in her hip as a result of the incongruity in the femoral head, though her hip was not dislocating. (*Id.* at 167.) Dr. Crain also discussed the results of her shoulder MRI, which showed "that there is edema at the level of the greater tuberosity and more posterior . . . consistent with a microfracture of bone." (*Id.*)

On October 1, 2002, Ortiz was examined by Dr. Yong M. Kim at the request of the Delaware Disability Determination Service (DDS). (*Id.* at 143-160.) Dr. Kim reported that Ortiz experienced a limited range of motion in her left hip and shoulder.[1] (*Id.* at 144.) He also found that "[t]here was moderate tenderness noted from [the left] shoulder without swelling or temperature elevation," as well as "moderate tenderness . . . around [the left] hip area." (*Id.*) Moreover, Ortiz experienced increasing pain in her left hip during the resistive test, and her grip strength was normal. (*Id.*) Ortiz was able to stand and walk on her toes and heels, though her gait was abnormal. (*Id.*) She ambulated with a walker "showing lack of [left] hip flexion" and "rotated her [left] pelvis instead of [left] hip flexion probably due to decreased [range of motion] and weakness." (*Id.*) Dr. Kim concluded that Ortiz had a "[d]isplaced fracture [of the left] femoral head with dislocation of [the left] hip and status post open reduction of hip dislocation

---

[1] Dr. Kim wrote:

> Abduction of [the left] shoulder was limited to 80 degrees with increasing pain. Forward [bending] was limited to 90 degrees . . . . [Left] hip [bending] was limited to 90 degrees. External rotation was 20 degrees. Internal rotation was 20 degrees. Abduction was 7 degrees.

(*Id.* at 144.)

and removal of fracture fragments," in addition to left shoulder pain with probable linear fracture of the left shoulder. (*Id.*)

On October 28, 2002, Dr. Crain performed a bipolar hemiarthroplasty of the left hip. (*Id.* at 163-164.) After surgery, Ortiz complained of spinal headaches and reported that she felt as if the room was spinning. (*Id.* at 328.) She was diagnosed with "ambulation and activities of daily living dysfunction status post hemiarthroplasty of the hip, toe touch, weight bearing to the left lower extremity," anemia, hypotension, headache, and constipation. (*Id.*) Subsequently, on November 5, 2002, the Christiana Department of Radiology obtained an x-ray of the left hip, which showed "no evidence of fracture or acute osseous process."[2] (*Id.* at 303, 330.) Further, during an examination conducted on September 2, 2003, Dr. Crain noted that Ortiz was "easily fatigued," "walk[ed] with an antalgic type gate," and there was evidence of left leg lengthening. (*Id.* at 437.) However, she appeared "well balanced with a lift in [her] right" shoe. (*Id.*)

Ortiz was then admitted to the Rockford Center Adult Partial Hospital Program on December 22, 2004, for evaluation and treatment for depression occurring "over the last two years after [a] motor vehicle accident where she sustained multiple fractures." (*Id.* at 221-223.) She "admit[ted] to occasional passive wishes to die," as well as "depressive mood, decreased appetite, decreased sleep with energy level, changes in concentration, feelings of helplessness, hopelessness, and worthlessness." (*Id.*) Ortiz further stated to treating physicians that she began to feel worse and had more frequent suicidal thoughts after the death of her grandchild two months prior. (*Id.*) She was diagnosed with single episode, severe major depressive disorder

---

[2] On November 12, 2002, Dr. Susan T. Depoliti reported that Ortiz had pain management problems during her admission to the Wilmington Rehabilitation Unit, as well as low blood pressure, and was treated for pain with OxyContin. (*Id.* at 298.)

4

without psychotic features and gastritis and treated with Effexor XR, Remeron, and Trazodone. (*Id.*)

On March 1, 2004, Dr. Alex Bodenstab reported that Ortiz had continued to have groin pain and that her "evaluation [was] consistent with chondrolysis." (*Id.* at 276-277.) As a result, she underwent "conversion to left total hip arthroplasty." (*Id.*) After the operation, Dr. Bodenstab observed on May 27, 2004, that Ortiz's "left leg [was] at least 2 cm longer than the right. (*Id.* at 433.) On September 21, 2004, he performed a revision on the left total hip arthroplasty. (*Id.* at 259-260.) On November 24, 2004, Dr. Bodenstab noted that "[t]here is still a slight discrepancy in lengths, but the implants appear to [be] well fixed and in acceptable position." (*Id.* at 432.)

On December 22, 2004, Dr. Bodenstab wrote that "[x]-rays of the left shoulder performed in the office consist of three views. Joint spaces all appear to be well maintained. There is a minimal anterior acromialspur." (*Id.*) Further, he injected "the left subacromial space . . . with Lidocaine, Marcaine, and Depot Medrol to see if this helps at all with the shoulder and particular upper arm pain." (*Id.*)

Finally, on February 23, 2005, Ortiz was examined a second time by Dr. Kim at the request of DDS. (*Id.* at 474-484.) Dr. Kim reported that "external rotation of [the left] hip was limited to 45 degrees and internal rotation was limited to 35 degrees," while "Patrick sign was strong positive on the [left] hip." (*Id.* at 475). Further, "[left] shoulder abduction was limited to 90 degrees with severe pain, and "[t]here was severe tenderness noted around [the left] shoulder without swelling, temperature elevation, or skin discoloration." (*Id.*) Also, Dr. Kim noted that Ortiz had "moderate tenderness . . . from lumbosacral junction, bilateral sacroiliac areas, and

5

lumbar paraspinal muscles with tightness;" her right pelvis was slightly elevated; and her trunk flexion was limited to 60 degrees with increasing low back pain. (*Id.*)

Muscle strength of both her upper and lower extremities was within normal limits, except for decreased left grip strength, and no muscle atrophy was observed. (*Id.* at 476.) Ortiz was not able to stand and walk on her toes or heels due to severe left hip pain. (*Id.*) Also, her gait was abnormal, "showing moderate antalgic gait favoring [the left] lower extremity," and she required a straight cane for long distance ambulation. (*Id.*) Dr. Kim diagnosed Ortiz with chronic left hip pain with status post multiple left hip surgeries including a total hip replacement, depression, impingement syndrome of the left shoulder, depression, and chronic lumbosacral strain and sprain. (*Id.*) He further commented:

> Walking and standing will be limited to 2 hours during an 8 hour day due to severe pain in her [left] hip and low back area. Sitting will be limited to 4 hours during an 8 hour day. Lifting will be limited to 5-10 lbs.

(*Id.*)

## B.    Hearing Testimony

### 1.    *Ortiz's Testimony*

At the hearing before the ALJ, Ortiz testified that she became disabled and stopped working on June 19, 2002, after she was involved in a motor vehicle accident in which she suffered a displaced fracture of the left femoral head with dislocation of the left hip. (*Id.* at 33, 40.) Prior to that time, Ortiz was employed as a supervisor at a chicken factory from 1989 to 1990 and as a hotel housekeeper from 1990 to 2002. (*Id.* at 37-38.) Both positions required long hours of standing and heavy lifting or other use of her hands. (*Id.*)

Ortiz underwent multiple surgeries on her hip after the accident. In June 2002, she had surgery for open reduction of her posterior hip dislocation with open treatment of her fracture

6

and removal of fractured fragments. (*Id.* at 40.)  In October 2003, she returned so that her hip could be reset; however, this surgery was unsuccessful as well. (*Id.*)  Ortiz then underwent left hip arthroplasty in March 2004 and revision in September 2004. (*Id.*)  Ortiz testified that, as a result of her hip problems, she must use a cane at all times and experiences continual pain at a level of nine on a scale of one to ten. (*Id.* at 41.)

Moreover, Ortiz noted pain in her left shoulder, which she rated as a ten out of ten without medication, and for which she has received injections. (*Id.* at 42.)  She stated that she can no longer raise her left arm in front of her body or over her head. (*Id.*)  She was also treated for depression and attempted to injure herself. (*Id.* at 44.)  She now sees a therapist and is on medication, though she still feels sad, has trouble sleeping, and loses her appetite. (*Id.* at 45.)  Ortiz also testified that she experiences headaches "mostly all the time." (*Id.*)  Finally, Ortiz has gastritis, for which she receives medication. (*Id.* at 46.)

Ortiz stated that she can walk for approximately ten minutes without resting, stand for only five minutes, and sit for ten minutes at a time. (*Id.* at 47-48.)  Ortiz can also climb stairs but it is painful for her to do so. (*Id.* at 47.)  She further testified that she cannot bend at the waist, kneel down, or lift any weight. (*Id.* at 48.)  She must receive assistance when getting in the shower and cannot fix her hair, dress, or brush her teeth without her boyfriend helping her. (*Id.* at 49.)  She cannot perform any household chores except for some dusting; as a result, her boyfriend cooks, does laundry, grocery shops, and runs simple errands for her. (*Id.* at 49-50.)  Ortiz additionally testified that she cannot attend any of her children's activities nor participate in any hobbies, though she sometimes attends church services and stays for as long as she is able to sit. (*Id.* at 50-51.)

7

Ortiz did not believe that she could work an eight hour a day job doing very light work if she was not allowed to lie down during the day. (*Id.* at 54.) She stated that she typically spends seven hours per day lying down on her side to relieve her hip pain. (*Id.*)

### 2.    *Vocational Expert Testimony*

At the same hearing before the ALJ, a Vocational Expert ("VE") classified Ortiz's previous work as a line worker/supervisor as semi-skilled and light, and her position as a housekeeper as unskilled and light. (*Id.* at 56.) The VE testified that a hypothetical person with Ortiz's age, education, and work history with medication side effects could not perform any of Ortiz's previous jobs.[3] (*Id.* at 56.) The VE further stated that there were several unskilled positions existing in significant numbers in the national and regional economy that this hypothetical person could perform. (*Id.* at 57.) The positions identified by the VE as meeting these criteria are packer, inspector, cashier, sedentary security guard, and assembler. (*Id.*)

### C.    **The ALJ's Findings**

Based on the medical evidence, and the testimony of the claimant and the VE, the ALJ determined that Ortiz retained the capacity for work that exists in significant numbers in the national economy and is not under a "disability" as defined in the Social Security Act. (*Id.* at 25.) In her written opinion, the ALJ documented her findings at each of the five steps mandated by 20 C.F.R. §§ 404.1520 and 415.920.

---

[3] The ALJ described the position as "a light level of exertion, stand/walk two hours in an eight-hour work day, sit about six in an eight-hour work day, limited pushing and pulling with the lower extremities . . . and this person should avoid concentrated exposure to extreme cold or wetness, vibrations, or hazards." (*Id.* at 56.)

The five-step evaluation requires the following sequential analysis:

> [T]he [Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial gainful activity, the [Commissioner] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. 404.1520(d). If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [Commissioner] must determine if the individual is capable of performing his past relevant work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is not capable of performing his past relevant work, then she must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy.

20 C.F.R. § 404.1520(f); *see Brewster v. Heckler*, 786 F.2d 581, 583-84 (3d Cir. 1986).

Further, the Regulations define substantial work activity as work that involves doing significant physical or mental activities. Work can be considered substantial even if it is done on a part-time basis or if less money is earned or work responsibilities are lessened from previous employment. Gainful work activity is the kind of work usually done for pay or profit, whether or not a profit is realized. (*Id.*) *See also* 20 C.F.R. §§ 404.1572 and 416.972.

After reviewing the evidence, the ALJ determined that Ortiz "has left hip degenerative joint disease, residuals of a motor vehicle accident, and left shoulder pain, impairments that are 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (*Id.* at 21.) Though Ortiz was unable to perform any of her past relevant

work and had no transferable skills from any past work, she retained the residual functional capacity to perform a significant range of sedentary work. (*Id.* at 26, Findings No. 7, 10-11.) The ALJ also found that this work, such as a security guard or assembler, existed in significant numbers in the national and regional economy. (*Id.* at 27, Findings No. 12.) Therefore, the ALJ concluded that Ortiz was not disabled within the meaning of the Act.

## III.   STANDARD OF REVIEW

### A.   <u>Motion for Summary Judgment</u>

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must "review the record 'taken as a whole' . . . draw[ing] all reasonable inferences in favor of the nonmoving party[,]" but refrain from weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (citation omitted). If the court is able to determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

### B.   <u>Review of ALJ Findings</u>

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence does not mean a "large or a considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. Jul. 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). To demonstrate that the ALJ's opinion is based on substantial evidence, the ALJ must make specific findings of fact to support his or her ultimate findings. *Portlock v. Apfel*, 150 F.Supp.2d 659, 667 (D. Del. 2001) (citing *Stewart v. Sec'y of HEW*, 714 F.2d 287, 290 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Sec'y of the Dep't of Health and Human Serv.*, 859 F.2d. 1156, 1159 (3d Cir. 1988).

## IV.   DISCUSSION

In this appeal, Ortiz argues that the Commissioner did not have substantial evidence to support the denial of disability benefits. Ortiz makes three arguments in support of this claim: (1) that the ALJ incorrectly stated information from a consultative report by Dr. Yong Kim which assessed Ortiz's ability to sit and stand during an eight hour workday; (2) that the ALJ failed to give proper weight to the opinion of Dr. Marcia Castro, Ortiz's treating physician, as required by the Social Security Regulations and Rulings; and (3) that the ALJ did not provide a fair hearing because she failed to follow several Social Security Rules and Regulations when reviewing the medical evidence of record. (D.I. 18.)

11

After having considered the parties' arguments and submissions, the court agrees with Ortiz that the ALJ's residual functional capacity (RFC) finding conflicts with Dr. Kim's reports on February 23, 2005. An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling 96-8P. A "regular and continuing basis" is defined as "8 hours a day, for 5 days a week, or an equivalent work scheduling." *Id.* Further, a sedentary job requires occasional walking and standing. *See* Social Security Ruling 83-10. "Occasionally" means occurring from very little up to one-third of the time. *Id.* At the sedentary level of exertion, periods of occasional standing or walking "should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." *Id.*

Here, the ALJ stated that Dr. Kim found that Ortiz "could occasionally lift and carry less than ten pounds and less than ten pounds frequently, stand and walk at least two hours *and sit about six hours in an eight-hour workday* . . . ." (Tr. 23) (emphasis added). However, Dr. Kim did not, in fact, determine that Ortiz could sit for this length of time in either his medical evaluation or medical source statement. (*Id.* at 474, 481-482.) Rather, in the medical evaluation, Dr. Kim found that "[s]itting will be limited to 4 hours during an 8 hour day." (*Id.* at 474.) Further, in the medical source statement, Dr. Kim indicated that Ortiz could sit "less than 6 hours in an 8-hour workday," selecting this choice over another fill-in-the-box option which limited sitting to "about 6 hours in an 8-hour workday.[4]" (*Id.* at 482.) Therefore, both reports conclude that Ortiz could not sit for approximately 6 hours.

---

[4] The medical source statement uses a check-in-the-box format. Question 3 provides the following options if an individual is impaired while sitting: (1) "less than about 6 hours in an 8-hour workday," (2) "about 6 hours in an 8-hour workday," or (3) "must periodically alternate sitting and standing to relieve pain or discomfort." (*Id.* at 481.)

The defendant argues that, even though Dr. Kim indicated in the medical source statement that Ortiz could sit for less than six hours, he also noted that she could stand or walk for "at least 2 hours in an 8-hour workday," thereby fulfilling the eight hour requirement needed to constitute a "regular and continuing basis" of employment. (D.I. 19.) The court finds this argument unpersuasive. Though Dr. Kim described Ortiz's standing and walking limitations as "at least 2 hours in an 8-hour workday," he was limited in his description to either "less than 2 hours in an 8-hour workday" or "at least 2 hours in an 8-hour workday" because of the document's check-in-the-box format.[5] (Tr. 481.) However, in Ortiz's medical evaluation, Dr. Kim more precisely concluded that her ability to walk and stand was "limited to 2 hours during an 8 hour day . . . ." (*Id.* at 474.) Therefore, the ALJ improperly cited the opinion of Dr. Kim to find that Ortiz could "occasionally" stand and walk, as defined in Social Security Ruling 83-10, such that she could perform sedentary work on a continual basis.

The court also agrees with Ortiz that the ALJ improperly discredited Dr. Castro's opinions and reports. The statutory standard for considering a treating physician's opinion clearly establishes that if a "treating source's opinion on the issue(s) of the nature and severity of the [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). The Court of Appeals for the Third Circuit addressed the issue of appropriate weight to be given to opinions of treating physicians in *Plummer v. Apfel*, 186 F.3d 422 (1999),

---

[5] Question 2 of the medical source statement provides the following choices: (1) "less than 2 hours in an 8-hour workday," (2) "at least 2 hours in an 8-hour workday," (3) "about 6 hours in an 8-hour workday," or (4) "medically required hand-held assistive device is necessary for ambulation." (*Id.* at 461.)

13

where it wrote that "treating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.[6]'" 186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 348, 1350 (3d Cir. 1987)). In the event that the record contains conflicting evidence, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F. 3d at 429 (quoting *Mason v. Shalala*, 994 F. 2d 1058, 1066 (3d Cir. 1993)). In order to reject a treating source's opinion outright, the ALJ must base the rejection on contradictory medical evidence, and "not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (citing *Plummer*, 186 F.3d at 429).

The ALJ in this instance did not afford Dr. Castro's opinion that Ortiz had the residual functional capacity of less than sedentary work any significant weight, stating that "the opinion of this doctor[] appears on a fill-in-the-blank form, with only marginal notes attached to it." (Tr. 22.) Further, the ALJ found that the opinion "conflict[ed] with the substantial evidence of record, documenting less severe limitations," as "[t]he doctor did not adequately consider the entire record including the statements of collateral sources including the objective findings of other treating physicians" nor did "the objective evidence of this record . . . support the level of severity that this doctor assigns." (*Id.*)

Moreover, the ALJ wholly disregards other records provided by Dr. Castro's office, the Singson Group, which treated Ortiz approximately twice a month from May 2, 2002, to January

---

[6] The regulations require that the ALJ evaluate the following factors: (1) examining relationship; (2)(i) length of treatment relationship and the frequency of examination; (2)(ii) nature and extent of the treatment relationship; (3) degree to which evidence supports the opinion; (4) consistency of the record as a whole; (5) specialization of the physician; and (6) other factors. *See* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6) (2006).

5, 2005. (*Id.* at 130-142, 376-377, 450-472.)  In these records, it is repeatedly noted that: (1) Ortiz has complained of left hip pain, (2) there is evidence of a discrepancy in leg length, and (3) she has experienced limitation of motion. (*Id.*)  Dr. Castro's notes also reflect that her office regularly communicated with other treating physicians, particularly Dr. Crain and Dr. Bodenstab. (*Id.*)  Additionally, Dr. Castro took primary responsibility for Ortiz's pain management by prescribing pain medication.  (*Id.*)  Thus, Dr. Castro's opinion should be given controlling weight, so long as it is not inconsistent with other substantive opinions.

The ALJ did find that the opinion of Dr. Anne Aldridge of DDS was inconsistent and "based on a thorough review of the evidence . . . ." (*Id.* at 22.).  This decision to give more weight to the report of Dr. Aldridge was, however, improper.  Though the ALJ pointed to the assessment of Dr. Aldridge to find that Ortiz could perform a significant range of light work, this report was completed *prior* to Ortiz's two arthroplasty surgeries. (*Id.* at 178-186.)  Accordingly, Dr. Aldridge's RFC assessment cannot be considered to be based on a thorough review of the evidence.  Indeed, given that this determination does not take into account treatment received after June 2003, the court is not persuaded that there is actually a conflict with the opinion of Dr. Castro.

In addition, the ALJ incorrectly concluded that Dr. Castro's evaluation conflicts with that of Dr. Kim.  In the *Current Residual Functional Capacity Evaluation*, Dr. Castro opined that Ortiz could not perform the full range of sedentary nor light work for eight hours per day.  (*Id.* at 376.)  Dr. Castro noted that Ortiz: (1) could occasionally lift or carry five pounds and no weight frequently; (2) could not work at a workstation; (3) needed to lay down, recline, or elevate her legs every ten to fifteen minutes of an eight hour workday; (4) can sit or stand for only ten

15

minutes at a time; (5) can walk one-third of a block; and (6) experiences severe daily pain. Similarly, in the *Medical Evaluation* and *Medical Source Statement of Ability to Do Work-Related Activities*, both dated February 23, 2005, Dr. Kim concluded that Ortiz: (1) could occasionally lift or carry five pounds;[7] (2) could stand for five to ten minutes at a time and sit for ten minutes of a time; (3) could walk one-half of a block at a time with a cane; and (4) experiences "severe chronic pain." (*Id.* at 474-484.) The court fails to see the conflict, and finds as a result that the opinion of Dr. Kim should be given controlling weight.

Because the ALJ improperly cited the reports of Dr. Kim, and failed to give the opinion of Ortiz's treating physician significant weight, the ALJ failed to present an accurate hypothetical question to the vocational expert. Hypothetical questions posed to a vocational expert must set out all of a claimant's limitations and impairments. *See Burns v. Barnhart*, 312, F.3d. 113, 123 (3d Cir. 2002) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). There is substantial evidence supporting a finding that a claimant has the vocational qualifications to perform specific jobs in the national economy only if the hypothetical questions posed to the vocational expert accurately portray the claimant's impairments. *See id.* When undisputed medical evidence exists of specific impairments that are not included in the hypothetical question, or the residual functional capacity assessment on which the hypothetical question was based is flawed, the expert's response is not substantial evidence supporting a determination. *See id.* (citing *Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984).

During the January 12 hearing, the ALJ solicited testimony from the vocational expert based on the description of a hypothetical individual with the limitations of "stand/walk two

---

[7] There was no fill-in-the-block choice for no weight or an increment less than ten pounds. (*Id.* at 481.)

16

hours in an eight-hour work day, sit about six in an eight-hour work day, limited pushing and pulling with the lower extremities . . . ." (Tr. 56.)  Based on these limitations, the VE concluded that a person with those limitations could be employed for light, unskilled employment, such as a packer, cashier, sedentary security guard, or assembler.  Because the ALJ based her finding, at step five of the evaluation process, on the premise that Ortiz could perform a significant number of jobs in the national economy on this deficient hypothetical question, the court finds that it was not based on substantial evidence.

## V.     CONCLUSION

For the foregoing reasons, and in the absence of evidence in the record that Ortiz can engage in gainful employment, the court concludes that ALJ Showalter's denial of disability benefits is not based on substantial evidence.  The court further finds that the record is fully developed, and that nothing would be added by remanding this matter for a rehearing. Accordingly, the court will deny the Commissioner's motion for summary judgment, grant Ortiz's motion for summary judgment, and direct the Commissioner to award disability benefits to Ortiz as of June 20, 2002.

Dated: May 1 7, 2009

CHIEF, UNITED STATES DISTRICT JUDGE

17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NILSA ORTIZ,                                    )
                                                )
                Plaintiff,                      )
                                                )
        v.                                      )        Civil Action No. 06-373-GMS
                                                )
MICHAEL J. ASTRUE,                              )
Commissioner of Social Security,                )
                                                )
                Defendant.                      )

**ORDER**

For the reasons stated in the court's memorandum of this same date, IT IS HEREBY

ORDERED that:

1.      The plaintiff's motion for summary judgment (D.I. 15) is GRANTED.

2.      The defendant's motion for summary judgment (D.I. 17) is DENIED.

3.      The Commissioner is DIRECTED to grant disability benefits to Ortiz as of June

        20, 2002.

4.      The Clerk of Court is directed to close this case.

Dated: May 14, 2009

                                CHIEF, UNITED STATES DISTRICT JUDGE

18